UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN LASALVIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 10 C 3076 |
| | ) | |
| CITY OF EVANSTON, OFFICER GIESE, | ) | Judge St. Eve |
| OFFICER PANEK, and SERGEANT GLEW | ) | |
| | ) | |
| Defendants. | ) | |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

W. Grant Farrar, Corporation Counsel
Thomas Anger, Assistant City Attorney
Katherine Agonis, Assistant City Attorney
2100 Ridge Avenue, Suite 4400
Evanston, IL 60201
(847) 866-2937 (tel.)
(847) 448-8093 (fax)

## INTRODUCTION

Plaintiff Kevin LaSalvia brings a host of federal and state claims against three individual Evanston police officers and the City of Evanston (the "City"), in connection with his arrest on April 5, 2010. LaSalvia claims that Officer Thomas Giese used excessive force, and that Officer Joseph Panek failed to intervene, when the two officers took LaSalvia into custody after he fled his vehicle during a traffic stop and led them on a foot chase. LaSalvia further claims that the two officers and Sergeant Ryan Glew unreasonably delayed medical attention for an ear injury he incurred during the arrest. The remaining three claims—Counts IV and V against the City and Officer Giese, and Count VI against the City alone—arise under Illinois law and address the use of force. For the reasons that follow, the City and the individual officers respectfully request that this Court grant summary judgment for the defendants on Counts I through III and decline to exercise its supplemental jurisdiction over the state-law claims.

## FACTUAL SUMMARY[1]

On April 5, 2010, Evanston patrol officers Giese and Panek responded to a call by Officer Christopher Tamburrino requesting backup as he effectuated a traffic stop on a vehicle driven by Kevin LaSalvia with a front-seat passenger. Def. 56.1 ¶¶ 8,11. Officer Tamburrino believed he had witnessed LaSalvia participate in a hand-to-hand drug transaction in the vehicle, and he had further discovered that LaSalvia had outstanding warrants from other jurisdictions. *Id*. ¶ 8. Officers Giese and Panek arrived at the scene just in time to witness LaSalvia exit his vehicle and flee. *Id*. ¶ 9, 12. They quickly stopped their squad car and pursued LaSalvia on foot. *Id*. ¶¶ 14-16. When they overcame him, all three went to the ground, where Officer Giese administered one (according to LaSalvia) or more punches to the exposed left side of LaSalvia's

---

[1] Defendants' Local Rule 56.1 statement, filed concurrently with this Memorandum, fully renders the facts and supporting evidence. Citations to that document are in the form "Def. 56.1 ¶ __."

1

head. *Id*. ¶ 16-17. Officers Giese and Panek then took LaSalvia into custody. *Id*. While Panek accompanied LaSalvia back to the squad cars—more of which had arrived—Giese searched the area for contraband. *Id*. ¶ 24. According to LaSalvia, immediately after he was taken into custody he asked "to go to medical." *Id*. ¶ 22. Assuming *arguendo* that this uncorroborated and contradicted statement is true, the request would have been made at approximately 7:16 p.m., within minutes of the initial stop and arrest. *Id*. ¶ 23.

Officers Giese and Panek then transported LaSalvia to the main Evanston police station, while Officer Tamburrino briefly remained on the scene to tend to LaSalvia's car and passenger. Def. 56.1 ¶¶ 25-26. At the police station, LaSalvia was brought to the main booking room for processing—the entirety of which is captured on video, with sound. *Id*. ¶ 27. LaSalvia sat quietly on a bench in the booking room for the majority of the time he was there. *Id*. ¶ 28. Officer Tamburrino arrived to complete the booking process. *Id*. ¶¶ 28-32. At one point LaSalvia inquired about the charges and whether he would be released on bond. *Id*. ¶ 31. Shortly after learning that he would be spending the night at the station, LaSalvia asked to speak with a sergeant. *Id*. ¶ 33.

Officer Giese summoned the sergeant on duty, Ryan Glew. Def. 56.1 ¶ 34. LaSalvia complained that Officer Giese had struck him and that he was having difficulty hearing out of his left ear.[2] *Id*. ¶¶ 34, 36. He asked Glew to go to the hospital, at approximately 7:54 p.m.[3] *Id*. ¶ 37. Sergeant Glew instantly agreed and had a team of paramedics from the Evanston Department of Fire and Life Safety dispatched immediately. *Id*. ¶¶ 37-39. The paramedics arrived at 7:59 p.m.

---

[2] Notably, throughout the booking process—as shown on the recording—LaSalvia could easily hear Officer Tamburrino, who was sitting at a distance off to LaSalvia's left asking questions to which LaSalvia responded without noticeable difficulty. Def. 56.1 ¶ 29.

[3] Although it is not material for purposes of the current motion, the individual police officers have testified that this was LaSalvia's first request for medical attention.

and instantly evaluated LaSalvia but did not administer any emergency treatment. *Id*. ¶¶ 38-40. LaSalvia waived treatment in writing and stated that he just wanted transport to the hospital. *Id*. According to protocol, two officers, in addition to any paramedics, must accompany a detainee to the hospital. *Id*. ¶ 42. A few minutes passed before an available two-man squad (other than Panek and Giese) was located to transport LaSalvia. *Id*. ¶¶ 42-43. In addition, the officers summoned an evidence technician, who arrived after the paramedics finished their evaluation and photographed LaSalvia before he was taken to the hospital. *Id*. ¶ 41.

At 8:16 p.m., the paramedics and officers exited the booking room to take LaSalvia to the hospital. Def. 56.1 ¶ 45. There, he was evaluated and ultimately diagnosed with a ruptured membrane in his left ear. *Id*. ¶¶ 46-50. The doctor rendered "supportive care" (not medical treatment) and recommended non-prescription pain relievers for any pain. *Id*. ¶¶ 52-53. LaSalvia was discharged in "good condition" with instructions to take Advil for the pain and follow up with an ear, nose, and throat specialist if needed. *Id*. LaSalvia never followed up with the specialist or visited a physician after leaving the hospital. *Id*. ¶ 56. By the following month, LaSalvia's hearing had returned to normal. *Id*. ¶ 57.

**ARGUMENT**

Summary judgment is proper if the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(c); *Budde v. Kane County Forest Preserve*, 597 F.3d 860, 862 (7th Cir. 2010). "To survive summary judgment, the plaintiff must provide specific facts establishing that there is a genuine issue of material fact….Specific facts are required; conclusory allegations will not do." *Scheerer v. Potter*, 443 F.3d 916, 919 (7th Cir. 2006); *see* Fed. R. Civ. P. 56(e).

Here LaSalvia cannot survive summary judgment because, viewing all facts in the light most favorable to him, as a matter of law: (1) the amount of force used during the arrest was consistent with Fourth Amendment standards of reasonableness; and (2) any delay LaSalvia experienced in accessing medical care was not unreasonable under the circumstances, particularly given the total absence of evidence that the injury was serious or that any delay worsened LaSalvia's condition.

Undoubtedly, LaSalvia will argue that disputed facts in this case preclude summary judgment. However, any such disputes—such as whether LaSalvia was actively resisting arrest when Officer Giese struck him and whether he first asked for medical care at the scene of his arrest—do not create any triable issues of material fact. A summary judgment motion, like one for directed verdict, asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986). Thus, the Seventh Circuit has repeatedly held that "a plaintiff's own uncorroborated testimony is insufficient to defeat a motion for summary judgment." *Weeks v. Samsung Heavy Industries Co., Ltd*. 126 F.3d 926, 939 (7th Cir. 1997) (collecting cases). *See also Butts v. Aurora Health Care, Inc*., 387 F.3d 921, 924 (7th Cir. 2004) ("The mere existence of an alleged factual dispute" is insufficient because "the nonmovant must present definite, competent evidence in rebuttal."). Here, the "disputes" that LaSalvia might suggest are illusory; they exist solely by virtue of his uncorroborated deposition testimony, and are in any case immaterial. Thus, summary judgment is appropriate and warranted.

I. **Defendants Are Entitled To Judgment On Counts I and II Because LaSalvia Cannot Establish That The Arresting Officers Used Or Failed To Prevent The Use Of Excessive Force.**

The Fourth Amendment's reasonableness standard governs the evaluation of a plaintiff's claim that law-enforcement officers employed excessive force during an arrest, an investigatory stop or any other type of seizure. *Stainback v. Dixon*, 569 F.3d 767, 771-72 (7th Cir. 2009). "An officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest," subject to the Fourth Amendment's "insistence on reasonableness." *Id*. at 772. All of the circumstances surrounding the arrest are relevant to whether the amount of force used was reasonable. *See id*.

Here, the force used by Officer Giese can hardly be viewed as excessive under an objective reasonableness standard. Officer Giese, with Officer Panek, had just chased LaSalvia down after he fled the traffic stop initiated by Officer Tamburrino. Def. 56.1 ¶¶ 9, 12. Given his outstanding arrest warrant, the officers knew that LaSalvia had evaded law enforcement before. Def. 56.1 ¶ 7. Both Giese and Panek testified that LaSalvia was continuing to resist them as they tried to take him into custody. *Id*. ¶¶ 15, 20. Officer Panek stated that LaSalvia was lying on top of his right hand to prevent the officers from placing him in handcuffs. Ex. 4, Panek Dep. 45. Officer Giese testified that he repeatedly had to instruct LaSalvia to stop resisting and to escalate his compliance techniques. Ex. 3, Giese Dep. 61:17-63:9. Under these circumstances, the blow to LaSalvia's head was a reasonable application of force to gain compliance and effectuate an arrest.

LaSalvia admits, as he must, that he resisted arrest at least at first—indeed, he attempted to avoid arrest altogether by running away from the traffic stop. Def. 56.1 ¶ 9. However, he also provided uncorroborated deposition testimony that he had stopped resisting by the time Officer

5

Giese struck him; he claims that he acquiesced to the arrest and had been lying still and compliant on the ground for 30 to 40 seconds when, all of a sudden, he felt a completely unprompted blow to his ear. *Id.* ¶ 21. But, as explained above, LaSalvia's own uncorroborated statement is not sufficient to withstand a summary judgment motion. *See Weeks*, 126 F.3d at 939. This mere scintilla of contrary evidence cannot satisfy the requirement that the plaintiff counter a summary judgment motion with specific facts demonstrating that there is a genuine issue for trial. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). "The practical test for summary judgment is whether if the evidence gathered in the summary judgment proceeding were presented at trial the party moving for summary judgment would be entitled to a directed verdict." *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1399 (7th Cir. 1997) (rejecting "morsels" of evidence upon which a jury could not reasonably base a verdict); *see Anderson*, 477 U.S. 242 at 250-51. Especially in light of the officers' consistent testimony that LaSalvia resisted efforts to take him into custody and LaSalvia's own admission that he fled from the police to avoid capture, no jury could reasonably find that LaSalvia was laying still and mute on the ground when he was suddenly struck in the head. Thus, this Court should grant summary judgment for Officer Giese on Count I.

Plaintiff also purports to bring a separate claim against Officer Panek for failing to prevent Officer Giese from using excessive force. But LaSalvia cannot marshal a shred of evidence to support his allegation that Panek "had a reasonable opportunity to prevent the harm…had he been so inclined, but failed to do so." Ex. 8, Compl. ¶ 25. LaSalvia himself testified that Officer Giese gave no indication that he was going to strike LaSalvia and that there was "no warning." Def. 56.1 ¶ 19. Likewise, both officers testified that there was no verbal threat or other signal to Panek that Giese was going to use force. *Id.* ¶¶ 18-19. Panek stated that Giese

6

"didn't say anything before he struck [LaSalvia] in reference to him striking [LaSalvia]," although Giese was telling LaSalvia to "stop resisting." Ex. 4, Panek Dep. 47. Giese likewise testified that immediately prior to administering the blow, he was instructing LaSalvia to stop resisting and give the officers his right hand. Ex. 5, Giese Dep. 60, 67.

Given this evidence, particularly the plaintiff's own testimony, it is impossible for LaSalvia to prove that during the rapidly unfolding arrest Panek had an opportunity to prevent the strike or strikes to LaSalvia's head (which in any case did not amount to excessive force). *See Collins v. Alevizos*, No. 10-1421, 2010 WL 5018208, at 2 (7th Cir. Dec. 9, 2010) (officers had no duty to protect absent a "plausible assertion that the officers had advance warning" of assault). Accordingly, even if this court were to deny judgment as to Officer Giese, it should grant summary judgment for Officer Panek on Count II.

## II. Defendants are Entitled To Judgment On Count III Because The Officers Did Not Unreasonably Delay The Treatment Of A Serious Injury.

To prevail on Count III, LaSalvia—an arrestee who had not yet received a judicial probable-cause determination—must show that his Fourth Amendment right to be free from unreasonable seizure was violated by a failure of Officers Giese and Panek and Sergeant Glew (together, the "officers") to address his ear injury in a timely manner. Claims such as LaSalvia's are adjudicated under an "objectively unreasonable" standard, not the "deliberate indifference" standard that applies to medical-attention claims raised by convicted prisoners or pretrial detainees under the Eighth and Fourteenth Amendments, respectively. *Lopez v. City of Chi.*, 464 F.3d 711, 719 (7th Cir. 2009). Under the applicable standard, only a response that is "objectively unreasonable under the circumstances" will give rise to liability. Reasonableness is gauged by four factors: (1) the officers' notice of medical need; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) competing police interests, whether administrative,

7

penological, or investigative. *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007); *Sides v. City of Champaign*, 496 F.3d 820, 823-28 (7th Cir. 2007). Because LaSalvia received the treatment he requested, the timing of that treatment is the sole issue as to whether his rights were violated. "Delay is not a factor that is either always, or never, significant. Instead, the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). However, it is settled that the Fourth Amendment "requires reasonableness, not immediacy." *Sallenger v. City of Springfield*, No. 08-3769, 2010 WL 5128850, at *5 (Dec. 17, 2010).

All of the applicable factors weigh in favor of judgment for the defendants. As to the first—notice—"a reasonable officer cannot be expected to accommodate an injury that is not apparent or that otherwise has not been made known to him." *Stainback*, 569 F.3d at 773. LaSalvia's injury was not apparent; he exhibited no outward signs of injury or distress, and the injury that was ultimately diagnosed was a rupture *inside* the ear. Def. 56.1 ¶¶ 28-30, 35-36, 44, 48, 50. Thus the officers were not independently on notice of any injury requiring care. And LaSalvia's statements did not provide clear notice. He initially expressed only a desire to go to the hospital. *Id*. ¶¶ 22, 37, 40. A request to go the hospital—which could easily be a tactic to delay or avoid detention in police lock-up—does not constitute notice to the police officers of a serious medical need. And once LaSalvia finally articulated the nature of his purported injury, he said that he was having trouble hearing, which a reasonable police officer might not equate with a serious injury requiring urgent care. In any case, the officers were responsive to LaSalvia's

8

request. Even assuming, as defendants must, that LaSalvia first requested "to go to medical" at the scene of his arrest,[4] he still got his wish within about an hour. *Id*. ¶¶ 22-23, 37-38, 45.

This leads to the second factor, which also favors the defendants: LaSalvia's injury was not objectively serious. "[T]he Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor—the scope of the requested treatment." *Williams*, 509 F.3d at 403. Here, although he bears the burden of proof, LaSalvia has not adduced a shred of objective evidence to establish that his injury was "serious." No objective medical or expert testimony demonstrates that a reasonable police officer should have suspected that LaSalvia was seriously injured. This absence is fatal to LaSalvia's claim. *See Davis v. Jones*, 936 F.2d 971, 973 (7th Cir. 1991) (plaintiff "presented no medical testimony" about severity of injury).

Moreover, while LaSalvia failed to adduce any evidence that he had a "serious" injury, the totality of the evidence in the record suggests exactly the opposite. LaSalvia exhibited no external physical signs of injury or pain other than redness on the side of the head where he had been struck. Def. 56.1 ¶¶ 28-30, 35. Video evidence shows him sitting calmly in the booking room, in no apparent distress. *Id*. ¶ 28. When Sergeant Glew arrived, LaSalvia complained of difficulty hearing but denied pain. *Id*. ¶¶ 34-36. And when the paramedics arrived, LaSalvia signed a waiver to the effect that he did not want them to treat him; he wished only to be taken to the hospital. *Id*. ¶ 40. At the hospital, he was told the injury would heal on its own and advised to take a non-prescription pain reliever (there is no evidence he was administered any pain medication). *Id*. ¶¶ 52-54. He was discharged in "good" condition with instructions to take

---

[4] This fact is disputed, but for purposes of this motion, the dispute is immaterial because even if LaSalvia asked at the arrest site to go to the hospital, he was taken there without unreasonable delay—within an hour.

9

Tylenol or ibuprofen and follow up with an ENT specialist if needed. *Id*. LaSalvia never consulted a specialist or saw a physician again about his ear. *Id*. ¶ 56. By the end of May, LaSalvia was feeling better and his hearing had "returned to normal."[5] *Id*. ¶ 57. He never missed work as a result of the injury, although he sometimes felt "pressure of the ear" while working. Ex. 1, LaSalvia Dep. 59. Thus LaSalvia can do no more than show that he was made uncomfortable by his ear during the booking process; however, "the Constitution does not require arrests to be conducted in comfort." *Sides*, 496 F.3d 820 at 828.

As to the third factor, which examines the scope of the requested treatment, the particular nature of LaSalvia's request justifies any short delay in fulfilling it. Applying the "sliding scale," the scope of treatment LaSalvia requested was not commensurate with the severity of the injury as gauged by a reasonable police officer. LaSalvia did not appear ill or injured, nor did he make any particular medical need known or ask for anything to alleviate pain; he just asked for transport to the hospital. Def. 56.1 ¶¶ 28-30, 35-37. And he received the precise scope of care he requested. This occurred within about an hour of his arrest, *id*. ¶ 45, with no unwarranted delay. Accordingly, this factor favors the defendants.

Fourth, to the extent that it was possible for LaSalvia to have received care earlier than he did, the brief delay was justified by legitimate police interests. The arresting officers and the evidence technician were available to book and process LaSalvia when he arrived at the station; this might not have been the case later in the night when he returned. Promptly processing and charging arrestees is a legitimate interest which is not unreasonable to advance, absent some urgent competing need for emergency medical care. *See Legg v. Pappas*, 383 Fed. Appx. 547,

---

[5] LaSalvia later contradicted himself, in response to inappropriate leading questions from his counsel, who suggested to LaSalvia that he gets dizzy, that his ear feels like it's clogged, and that there is "pain," although LaSalvia himself never said so. *See* Ex. 1, LaSalvia Dep. 71.

551 (7th Cir. 2010) (unpublished decision) (fourth factor satisfied because "the police have an interest in taking [Plaintiff] into custody because he has outstanding warrants"). Also, for the safety of arrestees, medical personnel, and officers alike, it is strictly required that two patrol officers (other than those with whom the detainee has scuffled) accompany any arrestee to the hospital. Def. 56.1 ¶¶ 42-43. As soon as available officers were identified, a two-officer escort was sent to the booking room for the trip to the hospital. *Id*. At the same time, the officers waited for an evidence technician to complete the booking process. All the while, the paramedics were present to monitor LaSalvia and treat him if necessary. *Id*. ¶ 44. Because the police were attending to legitimate law-enforcement tasks, and LaSalvia was in no danger or apparent distress, any resulting delay does not rise to the level of a constitutional violation. Indeed, the treating physician remarked than any delay would not have caused LaSalvia's condition to worsen. *Id*. ¶ 51.

The Seventh Circuit has noted, with respect to a two-hour delay in treatment, that "the public often waits longer at hospital emergency rooms." *Langston*, 100 F.3d at 1240. So too in this case, LaSalvia received medical care within a time period that is less than a typical emergency-room wait. And other than the offer of over-the-counter pain reliever, it turned out that no medical treatment was given—or needed—for this non-serious injury, which resolved on its own over time. Thus, applying the four factors, LaSalvia simply cannot establish that any delay—even assuming for the sake of argument that it was as long as LaSalvia claims—rises to the level of being "objectively unreasonable."

LaSalvia's case suffers from an even more fundamental flaw. Under Seventh Circuit precedent, an individual in custody who complains of a delay in treatment must present evidence of detrimental effect caused by the delay. *Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir.

11

2002); *Langston v. Peters*, 100 F.3d 1235, 1241 (7th Cir. 1996). Plaintiff must submit "verifying medical evidence that shows his condition worsened because of the delay." *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009). This means expert testimony or some other medical assessment: "***evidence of a plaintiff's diagnosis and treatment, standing alone, is insufficient***." *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007) (emphasis added). LaSalvia has none of the "verifying medical evidence" that is required; he merely has the most basic evidence of his diagnosis and treatment in the form of the emergency room records. Indeed, LaSalvia's purported injury has never been medically evaluated since he left the hospital on the night of his arrest. Thus, there is a total failure of proof as to whether any delay worsened LaSalvia's condition. And there is contrary evidence in the form of the testimony of the doctor who treated LaSalvia on the night of his arrest. Def. 56.1 ¶ 51.

LaSalvia simply cannot establish that it was not constitutionally permissible for the medical evaluation of his non-serious injury to be delayed by up to *one hour* while police officers carried out essential post-arrest duties. Therefore, this Court should grant summary judgment for the defendants on Count III.

### III. The Individual Officers Are Entitled To Qualified Immunity From The Federal Claims For Damages. [6]

The individual officers cannot be held liable for damages for either excessive force or a delay in medical care because they are entitled to qualified immunity. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808 at 815 (2009) (citing

---

[6] The federal claims, Counts I through III, do not name the City of Evanston as a defendant or target any employee in an official capacity, so there is no issue of *Monell* liability presented by this case.

*Harlow v. Fitzgerald*, 457 U.S. 800, 818(1982). It balances the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Id*. Qualified immunity questions must be resolved "at the earliest possible stage in litigation." *Id.*

LaSalvia can overcome the defense of qualified immunity only by demonstrating (1) that the officers violated his constitutional rights; and (2) that those rights were clearly established at the time of his arrest. *See Stainback*, 569 F.3d at 770. The Supreme Court "continue[s] to recognize that it is often beneficial" for a court to evaluate the elements in that order. *Pearson* 555 U.S. 223, 129 S. Ct. at 818. In any case, the defendants provisionally[7] concede that the Fourth Amendment protection against unreasonable seizures—the basis of all of LaSalvia's federal claims—was established at the time of LaSalvia's arrest. For now the only issue is whether Plaintiff can establish any violations of that constitutional right.

As the preceding sections demonstrate, LaSalvia cannot demonstrate that the officers violated his Fourth Amendment rights by using (or failing to prevent the use of) excessive force, or by unreasonably delaying medical treatment. The force applied by Officer Giese was well within the bounds of reasonableness under the circumstances, and LaSalvia has only his own uncorroborated, incredible statements to suggest that force was not reasonable because he submitted voluntarily to the arrest. Moreover, LaSalvia admits that Officer Panek had no advance notice that Officer Giese was going to administer blows to subdue LaSalvia, and therefore could not reasonably have been expected to prevent the contact. Finally, none of the officers unreasonably delayed LaSalvia access to medical care for his injury. He was evaluated

---

[7] Insofar as LaSalvia would argue that this right curtails law enforcement's ability to use reasonable force to effectuate arrests, or requires the instantaneous delivery of requested medical care irrespective of an injury's apparent severity, however, the defendants reject this broad—and legally unsupportable—interpretation of the Fourth Amendment.

by paramedics at the police station and transported to the hospital shortly after booking; moreover, during the time he was in custody, he did not exhibit any signs of physical strife indicative of an urgent need for care, and the apparent lack of any serious injury was confirmed by the subsequent diagnosis and recommended over-the-counter treatment. More importantly, LaSalvia has failed to adduce any evidence that any delay made him objectively any worse off. For all these reasons, LaSalvia cannot establish that the officers violated a clearly established constitutional right, and the officers are entitled to qualified immunity.

**IV.    This Court Should Decline To Exercise Supplemental Jurisdiction Over LaSalvia's State-Law Claims.**

"As a general matter, when all federal claims have been dismissed prior to trial, the federal court should relinquish jurisdiction over the remaining pendant state claims." *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007). This Court has adhered to that principle. *E.g., Lust v. Razzino*, No. 08 C 7346, 2010 WL 845942 (N.D. Ill Mar. 3, 2010) (St. Eve, J.) ("'When all federal claims have been dismissed prior to trial, the principle of comity encourages federal courts to relinquish supplemental jurisdiction pursuant to § 1367(c)(3).'"); *Ferrell v. Soto*, No. 06 C 5382, 2008 WL 342957 (N.D. Ill. Feb. 5, 2008) (St. Eve, J.) ("'It is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.'").

LaSalvia cannot show any reason to depart from the general rule in this case. Therefore, to the extent that this court grants summary judgment on Counts I though III, it should dismiss Counts IV through VI so that the plaintiff can bring the claims in state court. If this Court decides to retain jurisdiction over the state claims, the defendants respectfully request leave to move for judgment on the pleadings based on the defendants' immunity under the Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/1-101 *et seq*.

14

## CONCLUSION

For the foregoing reasons, the City of Evanston and the individual police officer defendants request judgment in their favor on Counts I through III and the relinquishment of supplemental jurisdiction on the remaining claims.

        Respectfully submitted,

**CITY OF EVANSTON, OFFICERS THOMAS GIESE and JOSEPH PANEK, and SERGEANT RYAN GLEW**

By:     s/ Katherine Agonis

W. Grant Farrar, Corporation Counsel
Thomas Anger, Assistant City Attorney
Katherine Agonis, Assistant City Attorney
2100 Ridge Avenue, Suite 4400
Evanston, IL 60201
(847) 866-2937
(847) 448-8093 (fax)
kagonis@cityofevanston.org