UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN LASALVIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 10 C 3076 |
| | ) | |
| CITY OF EVANSTON, OFFICER GIESE, | ) | Judge St. Eve |
| OFFICER PANEK, and SERGEANT GLEW | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF FACTS**

Now Come the Defendants, by and through their attorneys, the City of Evanston Law Department, and for their statement of material facts as to which they contend there is no genuine issue and that entitle them to judgment as a matter of law, submitted pursuant to Rule 56(b) and Local Rule 56.1(a)(3), state as follows:

**Parties, Jurisdiction, and Venue**

1. Plaintiff Kevin is a 32-year-old Caucasian male who resides in Palatine, Illinois, and is employed as an auto mechanic. At all relevant times he has resided in the Northern District of Illinois. Ex. 1, LaSalvia Dep. 5:19-22.

2. Defendant City of Evanston is a municipal corporation located in the Northern District of Illinois and the individual officer defendants were at all relevant times employed by the City of Evanston. Ex. 8, Answer ¶ 4.

3. All activities germane to this litigation occurred within the City of Evanston, in this judicial district. Ex. 8, Answer ¶ 5.

4. This court has jurisdiction: (1) because this civil action originates under the laws of the United States, 28 U.S.C. § 1331; (2) because LaSalvia alleges a deprivation, under color of State

1

law, of a right guaranteed by the Constitution of the United States, 28 U.S.C. § 1343; and (3) because the claims originating under Illinois law are so related to claims in the action within this Court's original jurisdiction that they form part of the same case or controversy, 28 U.S.C. § 1367(a).

### LaSalvia's Arrest

5. LaSalvia was arrested in the City of Evanston on April 5, 2010. Ex. 2, Tamburrino Dep. at Exhibit 1 (Arrest Report).

6. LaSalvia was charged with Resisting Arrest and Driving While License Suspended, and ultimately pleaded guilty to Resisting Arrest and Driving While License Suspended in the Circuit Court of Cook County. Ex. 1, LaSalvia Dep. 23:1 - 25:9; 68:4-5.

7. On April 5, 2010 there was an active warrant out for LaSalvia's arrest for Driving While License Suspended. Ex. 1, LaSalvia Dep. 15:8-16.

8. On April 5, 2010, at approximately 7:11 p.m.[1] Officer Christopher Tamburrino effected a traffic stop of LaSalvia after witnessing what he believed to be a hand-to-hand drug transaction and then verifying that LaSalvia that had an active warrant for his arrest. Ex. 2, Tamburrino Dep. 27:10-11; 34:18 - 35:3; Ex. 10, Video from Officer Tamburrino's squad car ("Squad Car Video").

---

[1] The Arrest Report (Tamburrino Dep. Ex. 1) indicates the arrest occurred at 17:13, or 5:13 p.m. However, subsequent deposition testimony—which is further supported by the in-squad video and booking-room video—established that Officer Tamburrino erroneously transcribed "17" as the military time for "7 p.m." Ex. 5, Glew Dep. 124:1-126:16. This error was reproduced on later-filed police reports that took the basic information from the arrest report. *See id*. 125:13-17. However, there is no dispute that the traffic stop actually occurred at 7:11 p.m. and that the arrest occurred within minutes of that time.

9.  Upon realizing that a police officer was following him, LaSalvia pulled his car to the right side of the road, stopped, and then alighted from the car and ran from the scene. Ex. 2, Tamburrino Dep. 38:19-21; Ex. 1, LaSalvia Dep. 17:16; 18:8.

10. Officer Tamburrino radioed this information and gave the location of the stop and the direction LaSalvia was running. Ex. 2, Tamburrino Dep. 39:15-18.

11. Officers Thomas Giese and Joseph Panek were in the area and responded to the call. Ex. 3, Giese Dep. 45:24 - 46:21; Ex. 4, Panek Dep. 26:23 - 28:13.

12. Upon their arrival, these officers observed LaSalvia exit his car and start running north on Dodge Avenue. Ex. 3, Giese Dep. 48:2-18; 49:5-8, 20-24; Ex. 4, Panek Dep. 28:7-17.

13. Officer Tamburrino, Officer Giese, and Officer Panek were all in full police uniform and travelling in marked squad cars. Ex. 3, Giese Dep. 33:22-24, 47:6-10; Ex. 2, Tamburrino Dep. 35:22; Ex. 4, Panek Dep. 27:22 - 28:1.

14. Immediately after exiting their squad car, Officer Giese and Officer Panek yelled "Police. Stop running. You're under arrest." Ex. 4, Panek Dep. 34:13-14; Ex. 3, Giese Dep. 50:9-13.

15. LaSalvia ignored these orders and continued to flee. Ex. 3, Giese Dep. 50:9-18 ; Ex. 4, Panek Dep. 34:10-15; Ex. 1, LaSalvia Dep. 27:3-10.

16. Eventually the officers reached LaSalvia and brought him to the ground. Ex. 1, LaSalvia Dep. 32:20-22.

17. While taking LaSalvia into custody Officer Giese administered one (according to LaSalvia) or more strikes to the exposed left side of LaSalvia's head. Ex. 1, LaSalvia Dep. 37:18-20; Ex. 3, Giese Dep. 67:4-21.

18. Officer Giese made no reference to striking LaSalvia prior to administering the strike(s). Ex. 4, Panek Dep. 47:20-21.

19. Officer Giese did not threaten to hit LaSalvia before striking him. Ex. 1, LaSalvia Dep. 75:19-21; Ex. 4, Panek Dep. 47:11-21 (October 13, 2010).

20. Before Officer Giese struck LaSalvia, Officers Giese and Panek were instructing LaSalvia to stop resisting them and to give them both of his hands. Ex. 3, Giese Dep. 60:14-15; Ex. 4, Panek Dep. 45:3-12.

21. According to LaSalvia, he was laying still and mute on the ground, in total submission to the officers, and he was struck on the head out of nowhere. Ex. 1, LaSalvia Dep. 32:16-19, 33:11-13, 35:22 - 36:5.

22. Accordingly to LaSalvia, as soon as he stood up, he was "pissed off" and "kept asking, I want to go to the medical." Ex. 1, LaSalvia Dep. 36:10-12.

23. The use of force and LaSalvia's arrest occurred at approximately 7:16 p.m. Ex. 3, Giese Dep. at Exhibit 2 (Use of Force Report).

24. LaSalvia was brought to the squad cars that were waiting and stayed there for several minutes thereafter while Officer Giese spoke with Officer Tamburrino and then searched the scene for contraband. Ex. 4, Panek Dep. 51:20-22, 54:5-12; Ex. 3, Giese Dep. 75:18-20, 83:9 - 85:6.

25. Officers Giese and Panek transported LaSalvia directly to the Evanston Police Department for booking. Ex. 1, LaSalvia Dep. 42:16-21; Ex. 3, Giese Dep. at Exhibit 1 (Field Supplementary Report).

26. In the meantime, Officer Tamburrino tended to LaSalvia's car and passenger. Ex. 3, Giese Dep. 83:18-22.

**LaSalvia's Booking**

27. LaSalvia arrived in the booking area of the main Evanston police station at approximately 7:26 p.m., or approximately 10 minutes after he was arrested. Ex. 9, Video of Processing/Booking Room ("Booking Room Video"); ¶ 24, *supra*.

28. During processing, LaSalvia did not claim to be or appear to be in any pain; he sat calmly and did not appear to be in physical distress. Ex. 9, Booking Room Video.

29. Additionally, LaSalvia was asked numerous booking questions by an officer to his left and never indicated that he was having a problem hearing the questions. Ex. 9, Booking Room Video.

30. Neither Officer Giese nor Officer Panek observed any injury to LaSalvia. Ex. 3, Giese Dep. 26:11-13; Ex. 4, Panek Dep. 57:5-6.

31. In the booking room, LaSalvia spoke to Officer Tamburrino about the charges against him and whether he could be released on bond. Ex. 9, Booking Room Video.

32. Officer Tamburrino told LaSalvia that he could not be bonded out that night. Ex. 9, Booking Room Video.

33. After learning that he would have to remain at the police station, LaSalvia—at approximately 7:35 p.m.—mentioned his ear for the first time since entering the booking room and requested to see a sergeant. Ex. 9, Booking Room Video.

34. Sergeant Ryan Glew arrived at the booking room and spoke to LaSalvia about what had occurred. LaSalvia complained that he had been punched. Ex. 9, Booking Room Video.

35. LaSalvia's ear did not show outward signs of injury other than some redness. Ex. 7, Norris Dep: 24:3-8; Norris Dep. at Exhibit 1 pp.3-5 (NorthShore Medical Records).

36. At approximately 7:50 p.m., Sergeant Glew asked LaSalvia if he was in pain, to which LaSalvia responded that he "just can't hear". Ex. 9, Booking Room Video.

37. LaSalvia then asked to go to the hospital to have his ear checked out—at about 7:54 p.m.—and Sergeant Glew immediately summoned an ambulance. Ex. 5, Glew Dep. 92:22 - 93:5; Ex. 9, Booking Room Video.

## Receipt of the Requested Medical Care

38. A team of paramedics from the Evanston Department of Fire and Life Safety arrived at the booking room at 7:59 p.m. and immediately evaluated LaSalvia. Ex. 9, Booking Room Video.

39. Again, LaSalvia complained only that he was having trouble hearing from his left ear. Ex. 9, Booking Room Video.

40. LaSalvia waived treatment from the paramedics and wished only to be transported to the hospital with no treatment from the paramedics. Ex. 6, Casey Dep. at Exhibit 2 (Release of Liability).

41. An evidence technician was called to the booking room to document LaSalvia's purported injuries. The evidence technician arrived after the paramedics, and after the paramedics made a full evaluation of LaSalvia. Ex. 9, Booking Room Video.

42. After LaSalvia was evaluated by the paramedics, two officers arrived to escort LaSalvia to the hospital—one to ride in the ambulance with LaSalvia and one to follow the ambulance in a squad car—as required by the protocols of both the police and fire departments. Ex. 5, Glew Dep. 90:22 - 91:2; Ex. 6, Casey Dep. 45:5-6.

43. Sergeant Glew determined that LaSalvia should not be escorted by the officers with whom he had had the altercation, especially because the paramedics were on scene to monitor LaSalvia's condition. Ex. 5, Glew Dep. 96:14-22.

44. Between the time paramedics arrived, and the time LaSalvia was transported to the hospital, paramedics were present and could have provided immediate care or transport for LaSalvia had they deemed it medically necessary. Ex. 6, Casey Dep. 48:4-7; Ex. 9, Booking Room Video.

45. LaSalvia left for the hospital in a police-escorted ambulance at 8:16 p.m. Ex. 9, Booking Room Video.

46. Upon his arrival at Evanston Hospital, LaSalvia was evaluated in the emergency room by Dr. Rachel Norris. Ex. 7, Norris Dep., 8:18-21; Norris Dep. at Exhibit 1 (NorthShore Medical Records).

47. Dr. Norris is a board-certified emergency medicine physician. Ex. 7, Norris Dep. 6:18-21

48. Dr. Norris made no notation that LaSalvia was in any acute distress. Ex. 7, Norris Dep. 24:15-20.

49. LaSalvia had no outward signs of injury including no drainage in the ear. Ex. 7, Norris Dep. 24:6-8.

50. Because there was no outwardly visible indication of injury, Dr. Norris needed a medical instrument to identify the cause of the symptoms in LaSalvia's ear—a ruptured membrane. Ex. 7, Norris Dep. 24:9-11.

51. According to Dr. Norris, any delay between being struck and going to the hospital did not worsen LaSalvia's medical condition or cause additional harm. Ex. 7, Norris Dep. 25:21 - 26:1.

52. LaSalvia's treatment included only "supportive care" and the suggestion that LaSalvia follow up with an Ear, Nose and Throat specialist if needed. Ex. 7, Norris Dep. 26:2-10.

53. LaSalvia was advised that he could treat any pain with over-the-counter medication. Ex. 7, Norris Dep. 27:20-23.

54. LaSalvia was not given, nor did he request, pain medication at the hospital. Ex. 1, LaSalvia Dep. 54:6-11.

55. Dr. Norris noted that, upon his discharge that night from the emergency room, LaSalvia indicated that his pain level was "tolerable," and Dr. Norris discharged him in "good" condition. Ex. 7, Norris Dep. at Exhibit 1 p.4 (NorthShore Medical Records).

56. LaSalvia never followed up with an ear, nose, and throat specialist. Ex. 1, LaSalvia Dep., 55:21 - 56:5.

57. LaSalvia's hearing in his left ear is "back to normal," having "cleared up" by May 2010. Ex. 1, LaSalvia Dep. 57:18 - 58:13.

58. LaSalvia claims that he has suffered from "humiliation or mental trauma" because he is afraid the Evanston Police Department will retaliate against him for filing his Complaint in District Court. LaSalvia Dep., 76:22 - 77:15; Ex. 8, Complaint at ¶¶23, 28, 33, 37, 41.

59. As of the date of his deposition (September 10, 2010) LaSalvia continued, as he had before that date, to visit the very area in Evanston in which he was arrested between four and five times every week. Ex. 1, LaSalvia Dep. 74:15 - 75:12.

        Respectfully submitted,

        **CITY OF EVANSTON, OFFICERS THOMAS GIESE and JOSEPH PANEK, and SERGEANT RYAN GLEW**

        By:    s/ Katherine Agonis

W. Grant Farrar, Corporation Counsel
Thomas Anger, Assistant City Attorney
Katherine Agonis, Assistant City Attorney
2100 Ridge Avenue, Suite 4400
Evanston, IL 60201
(847) 866-2937
(847) 448-8093 (fax)
kagonis@cityofevanston.org

9

# INDEX OF EXHIBITS IN SUPPORT OF
# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**Exhibit**         **Number**

Deposition of Kevin LaSalvia (09/10/2010) ............................................................... 1

Deposition of Christopher Tamburrino (10/25/2010) ................................................. 2
    Arrest Report……………………………………………..Dep. Ex. 1
    Evanston Police Department Offense/Incident Report…..Dep. Ex. 2
    Evanston Police Department lockup card………………..Dep. Ex. 3

Deposition of Thomas Giese (10/12/2010) ................................................................. 3
    Field Supplement…………………….......................Dep. Ex. 1
    Use of Force…………………….......................Dep. Ex. 2
    Evanston Police Department lockup card………………..Dep. Ex. 3
    Evanston Police Department Offense/Incident Report…..Dep. Ex. 4
    Arrest Report……………………………………………..Dep. Ex. 5

Deposition of Joseph Panek (10/13/2010) ................................................................. 4

Deposition of Ryan Glew (10/14/2010) ..................................................................... 5

Deposition of Peter Casey (10/14/2010) ................................................................... 6
    Evanston Fire & Life Safety Services report…………….Dep. Ex. 1
    Release of Liability……………………………………...Dep. Ex. 2

Deposition of Rachel Norris (01/13/2011) ................................................................. 7
    NorthShore Medical Records……………………….Dep. Ex. 1

Complaint with Answer ............................................................................................. 8

Video of processing/booking room .......................................................................... 9

Video from Officer Tamburrino's squad car............................................................ 10